191 So.2d 460 (1966)
P.N. COLEMAN, Jack Coleman, Leo C. Coleman, Alexander C. Liggett and American Celcure Wood Preserving Corporation, a Florida Corporation, Appellants.
v.
Lester COLEMAN, Jr., Dorothy W. Coleman, and M.J. Olivier, Appellees.
No. F-360.
District Court of Appeal of Florida. First District.
October 11, 1966.
Rehearing Denied November 22, 1966.
*461 Glickstein, Crenshaw, Glickstein & Hulsey, Jacksonville, and Parker, Foster, & Madigan, Tallahassee, for appellants.
Larkin, Lewis & Decker, and Boyd, Jenerette & Leemis, Jacksonville, for appellees.
STURGIS, Judge.
This is an appeal by the defendants below from a final decree granting injunctive and other relief to the plaintiff stockholders (appellees) against American Celcure Wood Preserving Corporation and the remaining stockholders of said corporation. The decree is affirmed.
In essence, the complaint and pleadings charged that the natural parties defendant, constituting the directors and officers of the defendant corporation, by action taken at a special meeting of the Board of Directors held September 12, 1962, unlawfully undertook to perpetuate themselves in office and control of the defendant corporation by fraudulently causing Class A voting stock held by the corporation to be issued to themselves, for which they gave no consideration other than the exchange of their Class B non-voting stock, share for share; and further, that said defendants, in pursuit of said unlawful purpose, at said meeting caused certain hereinafter described by-laws to be adopted at a special meeting of the Board of Directors.
Defendant-appellants P.N. Coleman and Jack Coleman and the defendant corporation by their affirmative defenses charged that plaintiffs were estopped to complain of the issuance of said Class A voting stock pursuant to the September 12, 1962, meeting of the Board of Directors because they had not complained of an exchange of Class B non-voting stock for Class A voting stock as authorized and issued pursuant to action of a former Board of Directors on February 28, 1950, more than 12 years prior to this suit. (Note: The record indicates that it is likely that the mentioned 1950 meeting was the first meeting of the Board of Directors of the corporation and that the distribution of stock at that time was in accordance with the organizational plan of the incorporators.)
The defendant corporation by its counterclaim sought to have all 163 shares of Class A voting stock held by plaintiffs invalidated on the ground that it was issued *462 in exchange for Class B non-voting stock pursuant to said February 28, 1950, meeting; and also sought to have all outstanding stock (Class B as well as Class A) treated and considered, without distinction, as voting stock. In defense of said counterclaim, plaintiffs asserted the doctrines of laches and estoppel.
(Note: The defendant corporation was organized under Florida law on December 29, 1949. Defendant P.N. Coleman, his brother, R.L. Coleman, and plaintiff M.J. Olivier were the original stockholders of the corporation.
The corporation was authorized by its certificate of incorporation to issue five hundred (500) shares of Class A voting stock and five hundred (500) shares of Class B non-voting stock. From March 1, 1950, and thereafter until the death of R.L. Coleman the Class A voting stock was held as follows:

P.N. Coleman - 150 Shares
R.L. Coleman - 150 Shares
M.J. Olivier - 65 Shares

Upon the death of R.L. Coleman his stock was divided between his surviving spouse and son and thereafter the said Class A voting stock was held as follows:

P.N. Coleman - 150 Shares
M.J. Olivier - 65 Shares
Dorothy W. Coleman - 75 Shares
Lester Coleman, Jr. - 75 Shares

Various individuals including the parties held Class B non-voting stock.)
Defendants P.N. Coleman and Jack Coleman by their counterclaim alleged that By-Law 44 of the defendant corporation[1] provides that an owner of stock receiving any bona fide offer for the purchase is obligated to give notice thereof to the remaining stockholders who shall have an option for thirty days to purchase said stock or interest therein on the same terms; and also alleged that in violation of said By-Law 44 plaintiffs Dorothy W. Coleman and Lester Coleman entered into an agreement on or about August 17, 1962, granting them the right to purchase plaintiff M.J. Olivier's 65 shares of Class A voting stock *463 in the defendant corporation and giving them his proxy to vote said stock. Said counterclaim sought to have said agreement and the proxies given in connection therewith declared void because of the alleged non-compliance by plaintiffs with the provisions of said by-law. It further sought to enjoin the voting of the said 65 shares of stock. In defense of said counterclaim the plaintiffs asserted the doctrines of estoppel and waiver and also asserted that By-Law 44 was invalid and inapplicable to said agreement.
On the basis of the pleadings, testimony and evidence, argument of counsel, and briefs submitted, the chancellor by the decree appealed found that the following issues were presented for determination:
"Issue No. 1. Whether the action of the Board of Directors at its meeting on September 1, 1962, purporting to authorize the issuance of Class A voting stock to P.N. Coleman, Jack Coleman, Leo C. Coleman and Alexander C. Liggett (who were then a majority of the directors and officers of defendant corporation) was unlawful, unauthorized and a breach of the defendants' fiduciary relationship.
"Issue No. 2. Whether the exchange authorized by the Board of Directors at its meeting on September 1, 1962, of the Class B non-voting stock of defendants, P.N. Coleman, Jack Coleman, Leo C. Coleman and Alexander C. Liggett, for Class A voting stock was unlawful, unauthorized and prohibited by the Certificate of Incorporation of defendant corporation because said certificate of incorporation expressly authorized the exchange of Class A voting stock for Class B non-voting stock, but did not expressly authorize and was silent on the point of exchanging Class B non-voting stock for Class A voting stock as was done by the defendants in this cause.
"Issue No. 3. Whether By-Law No. 44 (hereinafter described) purporting to place restrictions on the transfer of the stock of defendant corporation is valid, of no force or effect, or whether its enforceability has been waived by the defendants.
"Issue No. 4. Whether the pre-emptive rights of the plaintiffs under Section 608.42, Florida Statutes, were violated so as to render void the issue of Class A voting stock to the defendants on September 1, 1962, as authorized by the action of the Board of Directors on that date."
The decree thereupon made the following findings of fact and conclusions of law, and on the basis thereof decreed:
"1. The American Celcure Wood Preserving Corporation (the defendant corporation) is a corporation organized and existing under the laws of Florida, having been established and incorporated on December 29, 1949.
"2. The defendant corporation is authorized by its certificate of incorporation to issue 500 shares of Class A voting common stock and 500 shares of Class B non-voting common stock as set out in Article III of said certificate.
"3. Article III of said Certificate of Incorporation provides that any holder of Class A voting stock may elect to have all or part of his Class A voting shares converted into Class B non-voting stock, share for share. There is no provision in the certificate of incorporation for the exchange of or conversion of Class B non-voting stock into Class A voting stock.

*464 "4. (a) Since March 1, 1950, the Class A voting stock of defendant corporation was held as follows:

 Name of Stockholder Number of Shares
 Class A Voting Stock
-----------------------------------------------------------------------
 P.N. Coleman (Defendant) 150 Shares
 M.J. Olivier (Plaintiff) 65 Shares
 R.L. Coleman (the now deceased 150 Shares
 husband of Plaintiff
 Dorothy W. Coleman and father
 of Plaintiff Lester Coleman, Jr.)

"Upon the death of the above named R.L. Coleman, his shares of Class A voting stock were transferred on March 29, 1956, to his heirs who are plaintiffs in this cause:

 Name of Stockholder Number of Shares
 Class A Voting Stock
-----------------------------------------------------------------------
 Dorothy W. Coleman (Plaintiff) 75 Shares
 Lester Coleman, Jr. (Plaintiff) 75 Shares

"The outstanding Class A voting stock has been so held until the defendants by their acts as charged in the complaint attempted to issue additional Class A voting stock to perpetuate their control of the defendant corporation.
(b) At the time of and immediately prior to, the commission of the acts by the defendants complained of in the complaint the following parties owned Class B non-voting stock as indicated:

 Name of Stockholder Number of Shares
 Class B Non-Voting Stock
-----------------------------------------------------------------------
 P.N. Coleman (Defendant) 70 Shares
 Jack Coleman (Defendant) 7 1/2 Shares
 Leo C. Coleman (Defendant) 7 1/2 Shares
 Alexander C. Liggett (Defendant) 50 Shares
 Lester Coleman, Jr. (Plaintiff) 10 Shares
 Dorothy W. Coleman (Plaintiff) 10 Shares

"Numerous other persons, not parties to this cause, have owned Class B non-voting stock since the organization of defendant corporation.
"5. On August 17, 1962, the plaintiffs, Dorothy W. Coleman and Lester Coleman, Jr., entered into a written agreement with plaintiff M.J. Olivier, (Plaintiffs' Exhibit 13) providing, inter alia, that plaintiff, M.J. Olivier, shall give to plaintiffs Dorothy W. Coleman and Lester Coleman, Jr., his irrevocable proxy to vote 65 shares of his Class A voting stock and also making provisions for the ultimate purchase of this stock.
"6. On or about August 20, 1962, plaintiffs Lester Coleman, Jr., Dorothy W. Coleman and M.J. Olivier, requested, by instrument in writing (Plaintiffs' Exhibit 5) the Secretary (Defendant, Jack Coleman) of defendant's corporation to call a special meeting of the stockholders at the earliest date *465 possible consistent with giving due notice, the purpose of said meeting being, inter alia, to eliminate By-Law No. 44 and adopt certain other by-laws.
"7. (a) Before calling the special meeting of the stockholders as requested by plaintiffs, the defendant, P.N. Coleman, as President of defendant corporation, and defendant, Jack Coleman, as Secretary of defendant corporation, caused a special meeting of the Board of Directors of the defendant corporation to be called and held on September 1, 1962. The said meeting was attended by the following parties constituting all of the Board of Directors:
 P.N. Coleman (Defendant)
 M.J. Olivier (Plaintiff)
 Alexander C. Liggett (Defendant)
 Jack Coleman (Defendant)
At said meeting plaintiff, M.J. Olivier, was removed as the Treasurer and discharged as an employee of defendant corporation. At said meeting a resolution was adopted (all directors except plaintiff, M.J. Olivier, voting for it) purporting to authorize the exchange of Class B non-voting stock for Class A voting stock as follows:

 Name of Stockholder Shares of Shares of Class
 Class B non- A stock to be
 voting to be received there
 surrendered for
-----------------------------------------------------------------------
 P.N. Coleman 70 70
 Jack Coleman 7 1/2 7 1/2
 Leo C. Coleman 7 1/2 7 1/2
 Alexander C. Liggett 50 50

"(b) After this purported issue of Class A voting stock to defendants, there remained no unissued Class A voting stock. The plaintiffs were not offered an opportunity to exchange any of their Class B non-voting stock for Class A voting stock.
"(c) The mentioned acts of the said defendants were for the clear purpose of perpetrating and maintaining themselves in control of the defendant corporation and the purported adoption of amended By-Laws No. 8 and No. 43 as set out in the minutes of special meeting of the Board of Directors held on September 1, 1962, (Plaintiffs' Exhibit No. 4) were also clearly for the purpose of perpetrating and assuring the continued control of the defendants of defendant corporation and said by-laws were unfair to and discriminatory against the plaintiffs.
"8. By-Law No. 44 to the extent that it is pertinent in this cause of action purports to place a restriction upon the sale of the stock of defendant corporation providing that the remaining stockholders shall have an option to purchase the stock of a stockholder who has received a bona fide offer for the purchase of his stock. This provision expressed in various ways has appeared in By-Law No. 44 since its inception and in so far as this cause of action is concerned, and affected by it, it is the same By-Law as By-Law No. 44 which was adopted at the inception of the defendant corporation.

*466 "9. (a) On or about April 3, 1959, the defendant P.N. Coleman made an offer in writing (Plaintiffs' Exhibit No. 12) to plaintiff M.J. Olivier to purchase his Class A voting stock. In his said written offer P.N. Coleman proposed to facilitate the sale and purchase by representing that he would have the By-Laws restricting sale of such stock (by requiring other stockholders be given an option to purchase a pro-rata share) changed. The by-law referred to by said P.N. Coleman is one and the same by-law as By-Law No. 44. By this action the said P.N. Coleman has ignored and waived the benefit and enforceability of said By-Law No. 44.
"(b) The defendant P.N. Coleman has during the period beginning with the organization of defendant corporation to the time of the institution of this cause of action made numerous purchases and transfers of the stock of defendant corporation (from various stockholders) in which transactions the provisions of By-Law No. 44 were not complied with and were ignored and violated and no stockholder other than defendant P.N. Coleman was given an opportunity to purchase such stock on those occasions.
"10. At a special meeting of the Board of Directors held on February 28, 1950, (the defendant corporation was incorporated on December 29, 1949) P.N. Coleman, R.L. Coleman (the now deceased husband of plaintiff Dorothy W. Coleman and father of Lester Coleman, Jr.) and M.J. Olivier were by resolution authorized to exchange 2, 99 and 64 shares respectively of Class B non-voting stock for 2, 99 and 64 shares respectively of Class A voting stock. The parties to this cause have approved and acquiesced in this action on numerous occasions and have never complained until now as reflected by defendants' pleadings. The defendants are now estopped to complain and have waived any objections which they may have had in this connection.
"11. The rights of plaintiffs under Section 608.42, Florida Statutes were violated when they were not given an opportunity by defendant corporation and its Board of Directors to purchase their pro-rata share of the Class A voting stock sought to be issued by the action of said Board of Directors at its special meeting on September 1, 1962. The fact that all remaining shares of Class A voting stock was issued to defendants is indicative of the defendants' purpose to perpetuate and secure their control of defendant corporation in derogation of the rights of the plaintiffs.
"12. The exchange by the defendants of this Class B non-voting stock in return for Class A voting stock constituted no consideration whatsoever for said Class A voting stock and said Class A voting stock was therefore issued to the defendants absolutely without any consideration whatsoever.
"13. The fifty shares of Class A voting stock purportedly authorized by the Board of Directors at its meeting on September 1, 1962, to be issued to Alexander C. Liggett is represented by Stock Certificate No. 12 which certificate is still affixed to the stock certificate book and in fact and in law said fifty shares of Class A voting stock were never issued to or delivered to the said defendant Alexander C. Liggett.
CONCLUSIONS OF LAW
"1. The Court has jurisdiction of the subject matter and of the parties to this cause.

*467 "2. The equities in this cause are with the plaintiffs and against the defendants.
"3. The plaintiffs have sustained the allegations of their complaint and affirmative defenses in this cause and the defendants have failed to sustain their counterclaim and affirmative defenses.
"4. By-Law No. 44 is unenforceable, of no effect and has been waived and to enforce the provisions of said By-Law No. 44 against the plaintiffs would be manifestly inequitable.
"5. The written agreement between plaintiffs Dorothy W. Coleman, Lester Coleman, Jr., and Maxie J. Olivier (Plaintiffs' Exhibit No. 13) was not violative of the provisions of said By-Law No. 44 even if said by-law had been enforceable and in full force and effect.
"It is thereupon
"ORDERED, ADJUDGED AND DECREED as follows:
"1. The plaintiffs' complaint be and the same is, hereby, sustained to the extent indicated herein.
"2. The defendants' counterclaims are each dismissed with prejudice.
"3. The decree pro confesso heretofore entered against the defendants Leo C. Coleman and Alexander C. Liggett are, hereby, confirmed and ratified.
"4. By-Law No. 8 purportedly adopted by the Board of Directors of defendant corporation on September 1, 1962, and reading as follows:
`8. Special meetings of the stockholders for any purpose or purposes, unless otherwise prescribed by statute, may be called by the President or Secretary at the request, in writing, of a majority of the Board of Directors, or at the request, in writing, of stockholders owning two-thirds in amount of the entire capital stock of the corporation issued and outstanding and entitled to vote. Such request shall state the purpose or purposes of the proposed meeting.'
is null and void and of no effect.
"5. By-Law No. 43 of purportedly adopted by the Board of Directors of defendant corporation on September 1, 1962 and reading as follows:
`43. These By-Laws may be altered or amended by the affirmative vote of two-thirds of the stock issued and outstanding and entitled to vote thereat at any regular or special meeting of the stockholders if notice of the proposed alteration or amendment is contained in the notice of the meeting or by the affirmative vote of a majority of the Board of Directors, if the alteration or amendment be proposed at a regular or special meeting; PROVIDED, however, that no change of the time or place for the election of Directors shall be made within sixty days before the day on which such election is to be held and that, in case of any change of such time or place, notice thereof shall be given to each stockholder in person or by letter mailed to his last known post office address at least twenty days before the election is held.'
is null and void and of no effect.

*468 "6. The following described stock certificates of defendant corporation representing all of the Class A voting stock authorized to be issued by the Board of Directors at its meeting on September 1, 1962, are hereby declared null and void. The said stock certificates are described as follows:

 Name of Owner Certificate Shares
 Number
-----------------------------------------------------------------------
 Leo C. Coleman 9 7 1/2
 P.N. Coleman 10 70
 Jack Coleman 11 7 1/2
 Alexander C. Liggett 12 50

"The above named owners of said stock are each ordered and directed to forthwith surrender his respective, above described, stock certificate to the secretary of defendant corporation who is ordered to forthwith cancel all of said certificates and affix them to the stock certificate book of defendant corporation. Said stock certificate book was admitted in evidence in this cause as Plaintiffs' Exhibit No. 2 and the Clerk of this Court is authorized to allow the said Secretary to affix said certificates in said book as required by this decree. The above described Certificate No. 12 having never been issued to defendant Alexander C. Liggett shall be forthwith marked cancelled by said Secretary and the Clerk of this Court is authorized to allow him to do so. None of the above described shares of stock shall be voted at any meeting or for any purpose whatsoever.
"7. The defendant, Jack Coleman, who as Secretary of defendant corporation is, hereby, ordered and directed as such Secretary to forthwith give appropriate notice of the holding of the annual meeting of stockholders of defendant corporation to be held at the earliest time consistent with notice required by the by-laws. The first order of business of said meeting shall be the election of a Board of Directors. The Board of Directors so elected shall proceed forthwith to elect appropriate corporate officers and manage and conduct the business of the defendant corporation.
"8. Pending the holding of said annual meeting of the stockholders, the present officers and the Board of Directors of defendant corporation shall issue no stock of said corporation and shall not increase any salaries or compensation to any corporate officers, directors, agents or employees and shall grant or pay no bonuses or commissions and shall not sell or encumber any property or interests of said defendant corporation whatsoever.
"9. The Sixty-five (65) shares of Class A voting stock represented by Certificates numbered 3 and 6, respectively, may be voted at any meeting of the stockholders by the record holder thereof, who is now plaintiff M.J. Olivier, or his proxy holders or assignees.
"10. The defendants, P.N. Coleman, Jack Coleman and defendant corporation shall bear the plaintiffs' costs in this cause. The defendants, Leo C. Coleman and Alexander C. Liggett, having been served by publication shall not be taxed with such costs.
"11. This Court retains jurisdiction over this cause and the parties hereto to enforce, facilitate and implement the provisions of the Final Decree."
*469 We accept appellants' contention that defendant P.N. Coleman was the driving force and financial bulwark behind the organization of the defendant corporation and that he was motivated in substantial degree by interest in the welfare of his brother, R.L. Coleman, since deceased, and his former employee, plaintiff M.J. Olivier, who joined with him as incorporators in organizing the corporation in December 1949 and with him composed the first Board of Directors thereof. They were at the outset employed by the corporation in positions of responsibility in carrying out its business objects. It is also clear that defendant P.N. Coleman, an independently successful businessman, was not satisfied with the business acumen of his nephew, co-stockholder and co-director-officer, Lester P. Coleman, Jr., who inherited 75 shares of Class A voting stock from his father, R.L. Coleman, and that for some reason his friendly relation with plaintiff Olivier was ruptured. These circumstances have no bearing, however, upon the issues made in the trial court or on this appeal, which have to do with corporate powers and stockholders' rights which must be dealt with impersonally in accordance with applicable law. The corporate cloak, with which individuals are permitted to immunize themselves from personal liability, carries with it corporate responsibility and obedience to laws governing conduct of the corporate affairs.
The points of law involved on this appeal are:
1. Whether the corporate by-law purporting to restrict stock transfers was enforceable against plaintiffs under the facts of this case.
2. Whether the action of the natural parties defendant, as members of the Board of Directors, taken at the special meeting of the Board on May 1, 1959, purporting to repeal original By-Law 44 (footnote 1, supra) and to substitute therefor a new by-law (also numbered 44)[2] containing substantially the same restriction on transfer of corporate stock and having the same purpose as the former by-law, and the action of major stockholder P.N. Coleman, operated to estop the defendants from asserting By-Law 44, in either its original or substituted form as a bar to the validity of the agreement between plaintiffs Dorothy W. Coleman and Lester Coleman, Jr., with plaintiff M.J. Olivier.
3. Whether the court's refusal to permit cross-examination of plaintiffs' witness M.J. Olivier as to his prior written sworn statement filed in the cause and which he had been permitted to withdraw by order of court is reversible error.

POINT I.
Reasonable restrictions on transfer of corporate stock may be established by *470 charter provisions, lawfully enacted by-laws, or by agreement between stockholders. Corporate stock being property, its ownership is protected by the common-law rule which makes unenforceable restraints upon alienation that are unreasonable in character.
Section 608.13 (5), Florida Statutes, F.S.A., authorizes a Florida corporation, by action of its stockholders or directors, unless otherwise provided by its certificate of incorporation, to adopt, change, amend and repeal by-laws, not inconsistent with law or its certificate of incorporation. Said power is circumscribed, however, by equitable considerations governing the relation of the stockholders, officers and directors of the corporation to each other. As said in Volume I, Corporation Law & Practice (West Publishing Co.), sec. 266, p. 353:
"By-laws properly adopted (or amended) may become so unconscionable by force of circumstances as to warrant equitable intervention. They may also be waived or `amended' or `repealed' by custom or usage. This result is particularly evident where by-law restrictions on transfer of shares have long been ignored, and an attempt to enforce them and to bar transfer in the instant case is patently discriminatory."
To that effect see: Rogers v. Hill, 289 U.S. 582, 53 S.Ct. 731, 77 L.Ed. 1385 (1933); Elliott v. Lindquist, 356 Pa. 385, 52 A.2d 180, 169 A.L.R. 1369 (1947). Also see Volume 8, Fletcher Cyclopedia Corporations, perm. ed., Sec. 4200, p. 772, in which the author says:
"Stockholders or members may waive the by-laws, particularly those which operate in their favor or which advance or protect their rights as stockholders or members."
(Voss v. Northwestern Nat. Life Ins. Co., 137 Wis. 492, 118 N.W. 212 (1908); Grand Valley Irrigation Co. v. Fruita Improvement Co., 37 Colo. 483, 86 P. 324 (1906).)
And Section 4201, p. 774:
"Under the doctrine of equitable estoppel, also, a corporation may be prevented from availing itself of the full force and effect of a particular by-law as against a stockholder or member."
(Gray v. National Benefit Assn., 111 Ind. 531, 11 N.E. 477 (1887); Shartle v. Modern Brotherhood of America, 139 Mo. App. 433, 122 S.W. 1139 (1909).)
Defendant P.N. Coleman, his brother, R.L. Coleman, since deceased and plaintiff M.J. Olivier were the incorporators and holders of all the outstanding corporate stock. They constituted the officers and original board of directors of the corporation. It is seen that defendants Jack Coleman, Leo C. Coleman, and Alexander C. Liggett filed no answer in this cause, suffered decrees pro confesso to be entered against them, and did not participate in the proceedings and trial below on the merits. It would unduly extend this opinion to review the competent evidence in this voluminous record supporting the chancellor's findings of fact. Suffice it to say that it is ample to support the chancellor's conclusions of law and the decree appealed. As to Point I, we hold that By-Law 44 was not operative under the facts of this case to restrict plaintiffs in the transactions inter se relating to the purchase and sale of the M.J. Olivier Class A stock.

POINT II.
There is ample evidence to support the chancellor's finding that original By-Law 44 (footnote 1, supra), which was in force at the time plaintiffs Lester Coleman, Jr., and Dorothy W. Coleman entered into the agreement with plaintiff M.J. *471 Olivier pertaining to purchase and sale of this Class A stock and voting of his proxy thereon, had been waived by defendant P.N. Coleman in consequence of his inequitable conduct in ignoring said by-law when himself dealing with plaintiff M.J. Olivier in an effort to acquire said stock. In so holding, the chancellor followed the time-honored principle that equity regards the substance rather than the form of things, looks to the substance and not to the shadow, to the spirit and not to the letter; that it seeks justice rather than technicality, truth rather than evasion, common sense rather than quibbling. 12 Fla. Jur., Equity, Sec. 50.
The chancellor was eminently correct in holding that the defendants are estopped to assert the invalidity of the contract between Lester Coleman, Jr., and Dorothy W. Coleman with M.J. Olivier, and in rejecting their contention that the defendant members of the board of directors by their action of May 1, 1959, lawfully repealed original By-Law 44 and substituted another by-law to the same effect in its place. That action was patently a technical subterfuge in furtherance of the unlawful effort of the defendant directors to take over the control of the corporation. The action thus taken was unconscionable and warranted the intervention of the court of equity. It was totally ineffective as a vehicle to permit defendant P.N. Coleman, who had then assumed the position of alter ego of the corporation, to wipe clean the slate of his violations of original By-Law 44 and force plaintiffs to comply with the substituted by-law. The rights which he waived by his violation of the original By-Law 44 were identical with those which he sought to assert against plaintiffs under the new by-law. Equity rebels against that concept of justice and right under the law.

POINT III.
We have carefully considered but find no merit in the argument made by appellants under this point, which relates to the refusal of the trial court to permit cross-examination of plaintiff M.J. Olivier with respect to the content of a sworn statement which he had previously filed in the cause and in the meantime had been permitted by order of court to withdraw.
The appeal record shows that the statement consisted of an affidavit made by plaintiff M.J. Olivier on December 2, 1962, and filed in the cause for some undisclosed purpose. There is no copy of it in the record. On September 30, 1963, the court on motion of plaintiff M.J. Olivier permitted him to remove the affidavit from the file. When counsel for defendants later undertook on cross-examination to examine witness Olivier with respect to said affidavit and the matters recited therein, plaintiffs objected on the ground that the document had been withdrawn pursuant to said motion and order: Counsel for defendants then said:
"Your Honor, what counsel says is true, that affidavit, because of your Honor's order, to which I did not object, is no longer a part of this Court file * * *."
(Emphasis supplied.)
Appellees insist that it was not error to deny such examination under the circumstances and that the error, if any, was harmless because the testimony of witness Olivier was at most cumulative. We agree.
Appellants cite Schield Bantum Company v. Greif, 161 So.2d 266 (Fla.App. 1964), Collins v. Farley, 147 So.2d 593 (Fla.App. 1962), and Central Mutual Insurance Company v. Newman, 117 So.2d 41 (Fla.App. 1960), in support of their contention that the court committed reversible error in denying such examination, but we do not think these cases are applicable.
The Greif case involved a jury trial in which certain impeachment cross-examination was not allowed. Analysis of the *472 opinion reveals it has no bearing on the issues of this appeal.
In the Collins case the trial judge ruled that the income tax returns of plaintiff taxi driver were not reliable to reflect his true income because a large portion thereof was derived from gratuities, and on that premise denied cross-examination of plaintiff concerning his income tax return. The appellate court held that the trial judge "may not presume that the plaintiff failed to report such gratuities as income." No such problem is involved on this appeal.
In the Newman case the witness had "exclusive control" of the "subject matter" of a loss in question and there was no way to rebut his testimony except by a prior inconsistent statement; and the only defense available to the defendant was the lack of credibility of that witness. Such is not the factual situation in the case on review.
The rule is too well known to require elaboration that a judgment, order, decree or ruling of the trial court is generally presumed to be correct. It exists with respect to matters of law and procedure as well as to other matters on which the trial court acts within its jurisdiction. On appeal the prevailing party is entitled to the benefit of all reasonable inferences that can be drawn from the evidence viewed in the light most favorable to him.
The defendants filed a petition for rehearing in the trial court, stating:
"There are really but two genuine issues to be determined by the court in this case. Those two issues are (i) whether either, both or neither of the March 1, 1950 and September 1, 1962 issues of Class A stock are valid, and (ii) whether the plaintiff Olivier, desiring to sell his shares of stock is bound by the requirement of By-Law 44 which he participated in adopting."
We think this is a fair and complete statement of the issues before the trial court and in general these are the issues upon which this appeal depends. Having concluded that the chancellor correctly decided those issues and that appellants have failed to demonstrate error, the decree appealed is
Affirmed.
PER CURIAM.
The foregoing opinion and judgment by STURGIS, J., prepared prior to his death on May 6, 1966, is hereby adopted as the opinion and judgment of this Court.
It is so ordered.
RAWLS, C.J., and CARROLL, DONALD K., J., concur.
JOHNSON, J., dissents.
JOHNSON, Judge (dissenting):
This is an appeal from a final decree of the Circuit Court, Fourth Judicial Circuit, Duval County, entered March 3, 1964.
The files in this cause are voluminous and the testimony, merely by deposition, long. I will, however, attempt to narrow the pertinent history and facts of the case in order to present as clear a picture as practical, which I interpret differently from the majority of this court. The factual situation in this case seems to me to be the determinative factor in rendering justice to the parties involved.
In the beginning, December 29, 1949, Mr. P.N. Coleman associated with himself, his brother, R.L. Coleman and an old and trusted employee, Mr. M.J. Olivier, in a new corporation to be known as American Celcure Wood Preserving Corporation. *473 An indication of just who was the motivating personality in this corporation is indicated by the fact that there was issued to P.N. Coleman of the original stock, certificate #1 for 198 shares of Class A voting stock and 2 shares of Class B non-voting stock, whereas there was issued to R.L. Coleman certificate #2 for 1 share of Class A voting stock and 99 shares of Class B non-voting stock, and to Mr. M.J. Olivier certificate #3 for 1 share of Class A voting stock and 64 shares of Class B non-voting stock. A total of 110 additional shares of Class B non-voting stock was issued at this same time, February 11, 1950 to five other people.
Until the death of R.L. Coleman, about 1956, P.N. Coleman, R.L. Coleman and M.J. Olivier constituted the Board of Directors and were elected annually. In 1959, the stockholders increased the number of the members of the Board of Directors from three to four, and elected P.N. Coleman, M.J. Olivier, Alexander C. Liggett and Lester Coleman, Jr., as the new Board of Directors. It appeared that Lester Coleman, Jr. didn't get along with his fellow Board members or the agents and employees of the corporation, because at the meeting of the stockholders on January 10, 1961, Lester Coleman, Jr. was replaced as a director by Jack Coleman, another nephew of P.N. Coleman. It appears from the evidence that P.N. Coleman was afraid that Lester Coleman, Jr. would wreck the business if he got control. He so states in his deposition.
Mr. P.N. Coleman testified that his brother R.L. Coleman was not doing so well in business at the time this corporation was formed and the Coleman "clan" being close, he wanted to get his brother going in a better business. At the time, he was in the shoe business.
From 1961 on, at every meeting of the stockholders, Lester Coleman, Jr. and his mother, successors to the stock of R.L. Coleman, deceased, nominated Lester Jr. for membership on the Board of Directors, and each time the vote was the same, with Lester Jr. receiving 150 votes only, that being the amount of voting shares held by him and his mother. Mr. Olivier continued to vote with P.N. Coleman, making a total vote of 215, 150 of P.N. Coleman's and 65 of M.J. Olivier's.
In 1959, P.N. Coleman apparently after a verbal discussion, reduced to writing and submitted to Mr. Olivier for his approval, an offer to purchase Mr. Olivier's stock at a stated price with certain conditions attached, one of which was that Mr. Olivier would continue in the employ of another one of Mr. Coleman's corporations for a specified time. This proposal recognized the existence of a Corporate By-Law No. 44, which provided in substance that if a stockholder wished to sell his stock, he would notify the president to that effect and all the other stockholders would have an equal opportunity to buy the stock on a pro rata basis. This proposal was not accepted nor acted upon. The trial court at section 9 of its final decree referred to this proposal and held that by this action the said P.N. Coleman had ignored and waived the benefit and enforceability of said By-Law No. 44. I cannot agree with this statement by the trial court. The very language of the proposal recognized the limitation of By-Law No. 44, and specifically provided that P.N. Coleman would attempt to get By-Law No. 44 repealed so that the proposal could be carried out. The trial court was in error in this finding. The proposal was never acted upon.
At the annual meeting of the stockholders in January 1962, a Board of Directors was elected, namely, P.N. Coleman, M.J. Olivier, Jack Coleman and Alexander C. Liggett. P.N. Coleman cast 150 votes and M.J. Olivier cast 65 votes for the named directors for a total of 215 votes. Lester Coleman, Jr. voted 75 votes for P.N. Coleman, Alexander C. Liggett, Lester Coleman, Jr. and Dorothy W. Coleman. This Board was elected to serve until the next stockholders' meeting in January 1963.
*474 It appears that some trouble or breach arose between P.N. Coleman and M.J. Olivier, between the January 1962 meeting of the stockholders and August 17, 1962. Mr. P.N. Coleman refused to answer questions about the breach other than to say it happened in Mr. Coleman's office and that Mr. Olivier was leaving the company. Anyway, M.J. Olivier entered into a written contract on August 17, 1962 with Dorothy W. and Lester Coleman, Jr., whereby he gave them an irrevocable proxy to vote his 65 shares of stock at all meetings and agreed to sell them his stock. Immediately after this contract was entered into, Lester Coleman, Jr. and his mother, Dorothy W. Coleman and M.J. Olivier made a written request upon the secretary of the corporation to call a special meeting of the stockholders of said corporation, reciting that the purpose of the special meeting was to repeal By-Law No. 44, and adopt certain other By-Laws, including increasing the number of Directors to 5, and providing for the filling of vacancies. It is apparent from these actions, that with Mr. Olivier changing his affiliation from his old friend and employer, P.N. Coleman, to Lester Jr. and his mother, Dorothy W. Coleman, these three would have a voting strength of 215 votes to Mr. P.N. Coleman's 150. In other words, Lester Jr. and his mother could take over the corporation. P.N. Coleman testified that although Lester Jr. was his nephew, he was not capable of handling the business of the corporation and that if Lester Jr. got in control he would destroy the business and that in a short time Lester Jr. and his mother would be out on the streets without anything. To forestall this "take over" by Lester Coleman, Jr., P.N. Coleman, as president of the corporation, called a special meeting of the Board of Directors, which included M.J. Olivier, for September 1, 1962. At this meeting, a resolution was adopted which authorized P.N. Coleman to exchange 70 shares of Class B stock for Class A stock; Jack Coleman to exchange 7 1/2 shares of Class B stock for 7 1/2 shares of Class A stock; Leo C. Coleman to exchange 7 1/2 shares of Class B stock for 7 1/2 shares of Class A stock, and Alexander C. Liggett to exchange 50 shares of Class B for 50 shares of Class A stock. The corporate charter authorized a maximum of 500 shares of Class A stock, and the additional 135 shares of Class A stock issued pursuant to the above resolution used up the maximum of Class A stock authorized. This extra stock also assured P.N. Coleman, Jack Coleman and Alexander C. Liggett enough voting strength to control the election of a Board of Directors.
The appellees attack this latter action of the Board of Directors as being illegal and contrary to the charter provision, particularly By-Law No. 44, but later, contend that said By-Law No. 44 is invalid.
I think it well to note at this point, that on February 28, 1950 the Board of Directors adopted a resolution authorizing P.N. Coleman to exchange his 2 shares of Class B stock for 2 shares of Class A; and R.L. Coleman to exchange his 99 shares of Class B for 99 shares of Class A, and M.J. Olivier to exchange his 64 shares of Class B for 64 shares of Class A stock. The exchanges were made. This was in apparent violation of By-Law No. 44, but this action was ratified by the stockholders at their next meeting with blanket approval of all acts of the Board. Somewhere down the line, P.N. Coleman appears to have relinquished 50 shares of his Class A stock to his brother, R.L. Coleman, thereby reducing his voting stock to 150 shares and increasing R.L. Coleman's from 100 to 150 shares. Again, this was apparently done without regard to By-Law No. 44. R.L. Coleman was the father and husband of the appellees Lester Jr. and Dorothy W. Coleman, and he and M.J. Olivier, the other appellee, sanctioned such transfer. In the instrument above referred to wherein M.J. Olivier has agreed to sell his stock to Lester Jr. and Dorothy W. Coleman, it is specifically pointed out that the parties do not admit they are bound by By-Law *475 No. 44, yet these same parties try to invoke By-Law No. 44 as binding against the other stockholders. I cannot reconcile these inconsistent positions.
The charter of the corporation authorized the Board of Directors to issue the stock for valuable considerations. While there may have been some questions as to the exchange of Class B for Class A stock, it is clear that the Board was authorized to issue Class A voting stock up to a total not to exceed 500 shares. This the Board did at its September 1, 1962 meeting and I think the Board was acting within its legal authority as authorized by Article III of the corporate charter. The Class B stock which was surrendered, was sufficient consideration for the issuing of the new Class A stock.
It is unfortunate that in these closely held family corporations, disagreements arise which can and often do destroy the corporations, but in the case sub judice, it appears that the principal founder and real brains behind the appellant corporation's organization and even its continued existence, has been able to thwart the efforts of the disgruntled members of the corporation and to do it legally within the corporate power structure.
In the complaint and counterclaims, it is claimed that By-Law No. 44 renders the issuance of all the extra Class A stock, both in 1950 and 1962 invalid. The trial court found that the acts of the defendants at the Board of Directors' meeting of September 1, 1962, were for the clear purpose of perpetrating and maintaining themselves in control of the defendant corporation; also, that the amended By-Laws No. 8 and No. 43 were unfair and discriminatory against the plaintiffs. The defendants, at least P.N. Coleman, practically admitted that the purpose of the action of the Board of Directors of September 1, 1962, was for the purpose of preventing Lester Coleman, Jr. from getting control, but that it was for the best interest of the corporation that the said Lester Coleman, Jr. not get control. It appears from the undisputed testimony that Lester Coleman, Jr. could not operate the company, and could not get along with the key personnel of the corporation. It appears from the facts in the record that the plaintiff, M.J. Olivier, must have thought the same thing up to August, 1962, because he voted against Lester Jr. getting on the Board of Directors, even, in January 1962. I see nothing wrong with the action of the Board of Directors at their meeting of September 1, 1962. The Board was authorized by the charter of the corporation to issue an additional 135 shares of Class A voting stock, whether the stock was issued for cash or credit or exchange of stock does not appear to affect the legality of the action of the Board. By-Law No. 44 is not really material to the issue, because there was not any offer to sell the stock as contemplated by the By-Law No. 44, requiring notice and a right to purchase by all stockholders. It appears that P.N. Coleman, the real founder of the corporation, together with the existing Board of Directors were just one jump ahead of Lester Jr. and his mother in attempting to do exactly the same thing, that is, wrest control of the corporation from the defendants and especially P.N. Coleman. There is nothing in the corporate charter requiring the issuance of the remaining Class A shares of stock on a pro rata basis as found by the trial court in Section 11 of the final decree.
In Section 12 of the final decree the trial court held that the exchange of Class B for Class A stock was "no consideration whatsoever for said Class A voting stock * * *." I think the trial court exceeded its discretion here in substituting its judgment for that of the Board of Directors as to the value of the Class B stock so exchanged. The resolution of the Board declared that the surrender of said shares of Class B stock did constitute a good and sufficient consideration for the shares of Class A stock. There is no evidence offered by the plaintiffs to show that the Class B stock did not have a monetary *476 value sufficient to constitute a sufficient consideration for the Class A stock sale, and therefore the trial court made a finding of fact that is contrary to the evidence before it.
It appears to me from the composite picture presented in this case, that the real founder of and principal factor in the success of the defendant corporation, took advantage of the legal technicalities afforded him by the corporate charter to protect the corporation and its stockholders, including the plaintiffs, from stockholders who would destroy the company. I think the trial court's conclusions of law are erroneous; its findings in the instances pointed out supra, contrary to the evidence, and its final determination in favor of the plaintiffs to be error. There is a lack of sufficient evidence to warrant a finding by the trial court that the acts complained of, did or would result in injury to the plaintiffs, other than to their personal ego and desires.
The question raised as to the validity of By-Law No. 44, is well argued in the briefs for the respective parties, but as I do not consider By-Law No. 44 to be the determinative factor in this cause, it is unnecessary for me to dwell upon the merits of the contention of either party as to it, other than to state categorically that the By-Law No. 44 does not violate the Florida Statutes nor the prevailing case law.
The question of waiver, which has been raised, based on the evidence before us, does not appear to be of any consequence in this case.
The points raised in appellants' brief and as replied to in appellees' brief deal primarily with factual situations. As pointed out supra, there does not appear to be any violation of statute, equity, nor the charter or by-laws of the corporation.
For the foregoing reasons, I think the order appealed should be reversed. I cannot agree with the majority opinion of this court.
NOTES
[1] As adopted in 1950, By-Law 44 read:

"44. No holder of any share or shares of Common Stock of this corporation or of any interest therein shall sell or transfer any of his Common Stock without first notifying the President or Treasurer of the corporation, in writing, of the intention so to do and affording the other holders of Common Stock or of any interest therein an opportunity for a period of thirty days after the receipt of such notice, to purchase said stock or interest at the book value thereof, and such notice shall constitute the corporation the agent for the sale of such shares or interest. Notice that the corporation has obtained a purchasing stockholder shall be given to the retiring stockholder within such thirty-day period and he shall be bound at such time within fifteen days thereafter, upon payment of the book value, to transfer such shares or interest to the purchasing stockholder. In the event of default by the retiring stockholder, the corporation may receive the purchase money and shall thereupon cause the name of the purchasing stockholder to be entered upon the register as the holder of such shares or interest and shall hold the purchase money in trust for the retiring stockholder. The receipt of the corporation for the purchase money shall be a good discharge for the purchasing stockholder, and he shall be deemed and taken to be the owner and holder of such share or interest. `Book value' shall be the figure arrived at by deducting total liabilities from total assets, as shown by the books of the corporation (taking good will or other intangibles at One Dollar, taking furniture, fixtures, machinery and other equipment as set up on the last audit, less reserves, taking current accounts receivable at face value, less discounts for bad debts, and taking merchandise on hand and in transit at cost or market value, whichever is lower) and dividing the balance by the number of shares of Common Stock of the corporation at the time outstanding in the hands of stockholders. The opportunity to purchase shares of Common Stock of the corporation or interest therein shall be extended to the holders of Common Stock of the corporation in proportion to their respective holdings of such shares of the corporation, making all necessary adjustment to avoid fractions of shares."
[2] Substituted By-Law 44 reads:

"44. In the event any holder of any share or shares of Common Stock of this corporation, or of any interest therein, shall receive any bona fide offer for the purchase thereof, or any part thereof, which any such holder desires, in good faith, to accept and to consummate a sale thereof at the price and upon the terms contained in such offer, such holder shall thereupon given written notice to the President or Treasurer of the corporation of the terms of said offer, containing full details, and of the desire of such holder to make such sale.
"The remaining stockholders of the corporation shall then have an option for thirty (30) days after receipt of such written notice to purchase the said shares being offered for sale at the same price and upon the same terms and conditions as those contained in said offer. The opportunity to purchase said shares shall be extended to the other holders of Common Stock of the corporation in proportion to their respective holdings of such shares of stock of the corporation, making all necessary adjustment to avoid fractions of shares. The right of any stockholder of the corporation to purchase such proportion of such shares is assignable only to the other stockholders of the corporation."